

**UNITED STATES**
**CIVILIAN BOARD OF CONTRACT APPEALS**

December 20, 2013

RECEIVED

DEC 23 2013

United States Court of Appeals
for The Federal Circuit

Daniel E. O'Toole, Clerk
United States Court of Appeals
 for the Federal Circuit
717 Madison Place
Room 401
Washington, DC 20439

Subject:      CBCA 2544 - Kap-Sum Properties, LLC
              Lease No. GS-05B-17978
              CAFC No. 14-1126

Dear Mr. O'Toole:

The Board acknowledges receipt on December 2, 2013, of the Court's request for the certified list, described in Federal Rule of Appellate Procedure 17(b) to be transmitted to your office.

Enclosed herewith is the certified list of the record of the proceedings before this Board. The Board is retaining the record as described in Federal Circuit Rule 17(a), subject to further orders from the Court.

Sincerely,

*Cheryl L. Hilton*

CHERYL L. HILTON
Office of the Clerk

Enclosure (as stated)

CAFC No. 14-1126 (CBCA 2544)

cc:
David M. Cohen, Esq.
Director, Civil Division
Commercial Litigation Branch
Department of Justice
1100 L Street, NW, Room 12124
Washington, DC 20530

Stephen J. Siegel, Esq.
Julie Johnston-Ahlen, Esq.
Novack and Macey LLP
100 North Riverside Plaza
Chicago, IL 60606

Robert C. MacKichan, Jr., Esq.
Vedder Price
1401 I Street, N.W., Suite 1100
Washington, DC 20005

Richard O. Hughes, Esq.
Claire L. O'Donnell, Esq.
Office of General counsel
General Services Administration
1800 F Street, N.W.
Washington, DC 20405



**UNITED STATES**
**CIVILIAN BOARD OF CONTRACT APPEALS**

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

KAP-SUM PROPERTIES, LLC    )
    )
        Appellant,    )
    )
        v.    )    14-1126
    )
GENERAL SERVICES ADMINISTRATION,  )
    )
        Appellee.    )

CERTIFIED LIST OF RECORD
OF BOARD PROCEEDINGS
**KAP-SUM PROPERTIES, LLC**
**CBCA 2544**

The final decision of the Civilian Board of Contract Appeals that is before the Court for review is the Board's decision of October 31, 2013, in the appeal of **Kap-Sum Properties, LLC, CBCA 2544.**

The record in CBCA 2544 consists of the Board's correspondence file, which includes the parties' motions, pleadings, and the evidentiary record (the Rule 4 file and hearing transcript). A listing of these records, including a description of each, follows:

**I.**     **The Board's correspondence file is comprised of the following record:**

**a)**     <u>**APPELLANT'S SUBMISSIONS**</u>:

1.     Notice of Appeal (Sep. 2, 2011)

2.     Complaint (Dec. 22, 2011)

3.    Corrected copy of complaint with proposed exhibit 41 (damage evaluation) (Dec. 22, 2011)

4.    Motion to withdraw as counsel by David Black and Oliya S. Zamaray (Apr. 13, 2012)

5.    Notice of appearance by Stephen J. Siegel (Apr. 13, 2012)

6.    Request for issuance of subpoena for Social Security Administration to produce documents (May 18, 2012)

7.    Motion to compel (June 14, 2012)

8.    Request for issuance of subpoena for Agatha Joseph (June 21, 2012)

9.    Request for issuance of subpoena for Henette White (June 21, 2012)

10    Motion for sanctions (July 5, 2012)

11.   Letter re discovery disagreement (July 9, 2012)

12    Notice of filing of subpoena (July 10, 2012)

13    Request for issuance of subpoena for Agatha Joseph (July 11, 2012)

14.   Request for issuance of subpoena for Susan Kuffel (July 26, 2012)

15.   Letter by email regarding depositions (July 27, 2012)

16.   Motion in limine to bar the testimony of Henette White (July 31, 2012)

17.   Request for issuance of subpoena for Brenda Avitan (Aug. 2, 2012)

18.   Request for issuance of subpoena for Brenda Avitan (Aug. 2, 2012)

19.   Request for issuance of subpoena for William D. Schorsch (Aug. 27, 2012)

20.   Response in opposition to agency motion to compel production, extend discovery and suspend proceedings (Aug. 29, 2012)

21.   Trial Witness List (Sep. 5, 2012)

22.     Exhibit list (Sep. 5, 2012)

23.     Pre-hearing Brief (Sep. 5, 2012)

24.     Revision to appeal file (Oct. 30, 2012)

25.     Post-hearing brief (Nov. 2, 2012)

**b)     RESPONDENT'S SUBMISSIONS:**

1.      Notice of appearance by Richard O. Hughes (Sep. 13, 2011)

2.      Rule 4 File (Oct. 3, 2011)

3.      Notice of appearance by Claire L. O'Donnell (July 3, 2012)

4.      Respondent's demand for production and inspection (July 5, 2012)

5.      Respondent's responses to plaintiffs' first set of interrogatories (July 9, 2012)

6.      Notice of deposition (July 10, 2012)

7.      Respondent's supplemental interrogatories (July 10, 2012)

8.      Letter from Office of General Counsel, Social Security Administration (July 18, 2012)

9.      Letter by email regarding final decision letter terminating lease (July 25, 2012)

10.     Motion to compel production, extend discovery and extend proceedings (Aug. 27, 2012)

11.     Reply to contractor opposition (Aug. 30, 2012)

12.     Pre-hearing brief (Sep. 5, 2012)

13.     Preliminary witness list (Sep. 5, 2012)

14.     Request for guidance on witness issues (Sep. 7, 2012)

15.     Request for citation (Sep. 12, 2012)

16.    Post-hearing brief (Nov. 5, 2012)

**c)    NON-PARTY SUBMISSIONS:**

1.    Social Security Administration response to subpoena (June 7, 2012)

**d)    BOARD CORRESPONDENCE:**

1.    Notice of docketing (Sep. 2, 2011)

2.    Scheduling letter (Sep. 6, 2011)

3.    Email regarding conference call dates (Nov. 1, 2011)

4.    Conference memorandum (Dec. 5, 2011)

5.    Request for status (Jan. 24, 2012)

6.    Email regarding conference call (Jan. 25, 2012)

7.    Email regarding conference call (Feb. 27, 2012)

8.    Conference memorandum (Feb. 29, 2012)

9.    Conference memorandum (June 20, 2012)

10.    Conference memorandum regarding protective order (June 21, 2012)

11.    Letter regarding motion for sanctions and demand for production and inspection of documents (July 6, 2012)

12.    Letter to counsel regarding counsel of record (July 10, 2012)

13.    Conference memorandum (July 11, 2012)

14.    Motion to quash subpoena denied (July 20, 2012)

15.    Order regarding motion to compel production, extend discovery, and suspend proceedings (Sep. 5, 2012)

16.    Opinion denying appeal (Oct. 31, 2013)

## II.    **Appeal File**:

The appeal file (Board Rule 4(a)) submitted by the government consists of Exhibits 1 through 40; supplemental rule 4 file submitted by appellant consists of Exhibits 41 through 133.

| Exhibit | Date | Description |
|---------|------|-------------|
| 1 | 1/31/07 | Agency Request for Space (SF-81) |
| 2 | 3/13/07 | Advertisement in FEDB1ZOPPS |
| 3 | 11/5/07 | Acquisition Plan |
| 4 | 5/11/09 | Agency market survey recommendation letter |
| 5 | 5/11/09 | Pictures of subject building/space offered |
| 6 | 7/27/09 | Copy of solicitation sent to offerors |
| 7 | 1/4/10 | Request for Best and Final Offer |
| 8 | 1/7/10 | Final proposal revision from Kap-Sum Properties |
| 9 | 2/15/10 | Occupancy Agreement between SSA and GSA |
| 10 | 2/24/10 | Conditional award letter to Kap-Sum Properties |
| 11 | 3/2/10 | Executed Lease |
| 12 | 3/2/10 | Lease award posted on FEDB1ZOPPS |
| 13 | 5/25/10 | Email from CO to Hausman re existence of bus stop |
| 14 | 5/26/10 | Email from CO to Hausman re too far to walk |
| 15 | 8/25/10 | Email from CO to Hausman re bus stop required |
| 16 | 9/1/10 | Email from Schorsch to CO re letter to Evanston Mayor |

| 17 | 9/1/10 | Letter from Schorsch to Evanston Mayor re bus stop |
| 18 | 9/3/10 | Email from city of Evanston to Schorsch re ridership |
| 19 | 9/7/10 | Email from CO to Hausman re quantity of ridership |
| 20 | 9/23/10 | Email from CO to Hausman re SSA transportation needs |
| 21 | 9/23/10 | Email from Schorsch to City of Evanston re bus stop critical |
| 22 | 9/29/10 | Letter from Kap-Sum Properties to CTA requesting meeting |
| 23 | 10/19/10 | Email from CO to Bond re terms of lease |
| 24 | 12/20/10 | Letter from CTA to City of Evanston re bus route deviation |
| 25 | 1/6/11 | Email from CO to Hausman re petition to have bus service sent to SSA Commissioner, Senators Durbin and Burris |
| 26 | 1/24/11 | Email from Hausman to City of Evanston re bus stop status |
| 27 | 2/7/11 | Email from Hausman to City of Evanston to push forward |
| 28 | 4/18/11 | Letter from CO to Bond restating need for bus stop |
| 29 | 4/22/11 | Letter from Bond to CO claiming lease does not require bus stop |
| 30 | 4/25/11 | Letter from Evanston Mayor to CTA re bus route no. 200 |
| 31 | 5/23/11 | Email from CO to Bond space does not meet GSA requirement |
| 32 | 6/2/11 | Email from CO to Bond Evanston needs public transportation |
| 33 | 6/16/11 | Email from CO to Bond re probability of a bus stop |
| 34 | 6/27/11 | Email from City of Evanston to Hausman re dates for meeting |
| 35 | 7/28/11 | Lessor's certified claim |
| 36 | 8/11/11 | Letter from GSA to CTA requesting decision on bus stop |

| 37 | 8/29/11 | Final Decision of the contracting officer |
|----|---------|-------------------------------------------|
| 38 | 9/2/11 | Notice of docketing |
| 39 | 9/8/11 | CTA response to GSA letter dated August 11, 2011 |
| 40 | 1/15/10 | CTA Monthly Ridership Report-December 2009 |
|    | 9/3/09 | CTA reminds customers of Upcoming Services Changes |
|    | 8/12/09 | Changes approved for two CTA bus routes serving Evanston |
|    | 8/12/09 | CTA Ordinance No. 009-85 eliminating route #200 Main shuttle |
|    | 7/26/09 | Residents air bus line concerns |
|    | 7/22/09 | Bus Route Hearing (Central Street Neighbors Association |
|    | 7/12/09 | Notice CTA to hold public hearing on bus route elimination |
|    |         | History of bus route #200 main shuttle |
| 41 |  | Outline of events created by Jerald Helland |
| 42 |  | Lease File Checklist |
| 43 | 8/3/95 | SSA resident station space allocation standard |
| 44 |  | Excerpt from SSA resident station space allocation standard, with note from Helland to McKenna |
| 45 | 5/9/09 | Itinerary for SSA Evanston Market survey |
| 46 | 7/9/09 | Article entitled "CTA plans Evanston route cut" |
| 47 | 7/27/09 | Letter from GSA to Hausman enclosing SFO |
| 48 | 8/12/09 | Article entitled "Changes approved for two CTA bus routes serving Evanston" |
| 49 | 8/12/09 | CTA Ordinance No. 009-85 |
| 50 | 1/4/10 | Letter from Helland to Hausman re reopening of negotiations - request for best and final offers |
| 51 | 1/7/10 | Letter from Schorsch to Helland re final proposal revision |

| 52 | 1/8/10 | Emails from Hausman to Helland |
| 53 | 1/22/10 | Occupancy agreement between SSA and GSA |
| 54 | 2/15/10 | Occupancy Agreement between SSA and GSA |
| 55 | 2/24/10 | Award intent letter |
| 56 | 2/26/10 | Invoice from Schorsch to Bond |
| 57 | 3/1/10 | Email from Hausman to Helland |
| 58 | 3/2/10 | U.S. government lease for real property |
| 59 | 3/3/10 | Posting confirmation |
| 60 | 4/14/10 | Meeting minutes |
| 61 | 5/12/10 | Email from Hausman to Auld |
| 62 | 5/12/10 | Email from White to Hausman |
| 63 | 5/18/10 | Email from Hausman to Dance |
| 64 | 5/25/10 | Email from Helland to Hausman |
| 65 | 5/26/10 | Email from Helland |
| 66 | 6/14/10 | Email from Hausman to Dance |
| 67 | 6/14/10 | Email from Hausman to Dance |
| 68 | 7/13/10 | Email from Hausman to Helland |
| 69 | 7/13/10 | Email from Hausman to Bond |
| 70 | 8/4/10 | Email from Dance to Bond and Hausman |
| 71 | 8/4/10 | Email from Hausman to Helland |

| 72 | 8/4/10 | Email from Hausman to Bond |
| 73 | 8/9/10 | Letter from Hausman to Bond |
| 74 | 8/17/10 | Letter from Bond to Helland |
| 75 | 8/19/10 | Email from White to Helland |
| 76 | 8/24/10 | Email from Hammell to McKenna |
| 77 | 8/25/10 | Email from Helland to Hausman |
| 78 | 8/31/10 | Email from Helland to Bond |
| 79 | 9/1/10 | Email from Bond to Helland |
| 80 | | Intentionally Omitted |
| 81 | 9/16/10 | Email from Hausman to Dance |
| 82 | 9/21/10 | Letter from Bond to Helland |
| 83 | 9/22/10 | Email from helland to Hausman |
| 84 | 9/23/10 | Email from Helland to Hausman |
| 85 | 9/27/10 | Email from Helland to Schorsch |
| 86 | 10/5/10 | Email from White to Kuffel |
| 87 | 10/19/10 | Email from Helland to Bond |
| 88 | 10/19/10 | Email from Bond to Helland |
| 89 | 11/1/10 | Email from Helland to Hausman |
| 90 | 11/10/10 | Email from Helland to White |
| 91 | 11/16/10 | Email from Helland to Hausman |

| 92  | 12/3/10  | Email from White to Helland |
| 93  | 12/16/10 | Email from Helland to Hausman |
| 94  | 1/11/11  | Email from Hausman to Bond |
| 95  | 1/11/11  | Email from Hausman to Bond, Schorsch |
| 96  | 1/24/11  | Email from Helland to Hausman |
| 97  | 1/31/11  | Email from White to McKenna, Helland |
| 98  | 2/16/11  | Email from Helland to White |
| 99  | 2/16/11  | Email from Helland to White |
| 100 | 3/21/11  | Email from White to Hammell, Helland, Auld |
| 101 | 3/22/11  | Email from Hausman to Schorsch |
| 102 | 4/5/11   | Email from Bond to Helland |
| 103 | 4/7/11   | Email from Hammell to Dance |
| 104 | 4/22/11  | Letter from Bond to Helland |
| 105 | 4/29/11  | Letter from Bond to Helland |
| 106 | 5/23/11  | Email from Helland to Lane |
| 107 | 5/26/11  | Email from Helland to Bond |
| 108 | 6/2/11   | Email from Bond to Helland |
| 109 | 6/3/11   | Email from Kuffel to Helland |
| 110 | 6/7/11   | Email from Bond to Helland |
| 111 | 6/7/11   | Helland's handwritten notes |

| 112 | 6/8/11 | Email from Bond to Helland |
| 113 | 6/16/11 | Email from Helland to Bond |
| 114 | | Intentionally omitted |
| 115 | 9/8/11 | Letter from CTA to GSA |
| 116 | 8/6/12 | Kap-Sum Properties, L.L.C.'s updated damage calculation |
| 117 | 6/8/12 | Planet fitness fully executed lease |
| 118 | | Damage documents |
| 119 | | Consumer Price Index-urban Wage Earners and Clerical Workers original data value |
| 120 | 8/22/12 | Expert report of Mr. Jamie A. Scruggs |
| 121 | | Subpoenas to SSA and its employees/correspondence, filings and orders re same/FOIA requests to SSA and SSA letters in response |
| 122 | 8/13/12 | Deposition designations and designated exhibits not in Rule 4 file - John W. Auld, Jr. |
| 123 | 8/16/12 | Deposition designations and designated exhibits not in Rule 4 file - Joshua H. Hausman |
| 124 | 7/25/12 | Deposition designations and designated exhibits not in Rule 4 file - Jerald M. Helland |
| 125 | 8/16/12 | Deposition designations and designated exhibits not in Rule 4 file - William D. Schorsch |
| 126 | 7/24/12 | Termination for default letter |
| 127 | 7/25/12 | Exhibits from the deposition of J. Helland |
| 128 | 8/10/12 | Exhibits from the deposition of R. Bond |

| 129 | 8/13/12 | Exhibits from the deposition of J. Auld |
| 130 | 8/15/12 | Transcript of the deposition of W. Schorsch |
| 131 | 8/16/13 | Exhibits from the deposition of W. Schorsch |
| 132 | 8/16/12 | Transcript of the deposition of J. Hausman |
| 133 | 8/16/12 | Exhibits from the deposition of J. Hausman |

## III.  **Hearing Transcripts:**

September 10, 2012, pages 1-277, 278-400
September 11, 2012, pages 401-655, 656-826

I declare to the best of my knowledge that the foregoing is a true and correct list of all documents and exhibits comprising the record in CBCA 2544.

*Cheryl L. Hilton*

CHERYL L. HILTON
Office of the Clerk
Civilian Board of Contract Appeals
202-606-8800; 202-606-0019 [fax]

UNITED STATES
CIVILIAN BOARD OF CONTRACT APPEALS

DENIED: October 31, 2013

CBCA 2544

KAP-SUM PROPERTIES, LLC,

Appellant,

v.

GENERAL SERVICES ADMINISTRATION,

Respondent.

Stephen J. Siegel and Julie Johnston-Ahlen of Novack and Macey LLP, Chicago, IL, and Robert C. MacKichan, Jr., of Holland & Knight LLP, McLean, VA, counsel for Appellant.

Richard O. Hughes and Claire L. O'Donnell, Office of General Counsel, General Services Administration, Washington, DC, counsel for Respondent.

Before Board Judges **SOMERS**, **VERGILIO**, and **McCANN**.

**VERGILIO**, Board Judge.

On September 2, 2011, the Board received a notice of appeal from Kap-Sum Properties, LLC (lessor) concerning its lease, GS-05B-17976, with the General Services Administration (agency). The lease was for a potential fifteen-year period, ten years guaranteed. After receipt of design intent drawings from the agency, which indicated basic space layout for a proposed tenant, the lessor was to finalize drawings and build out the space. The lessor terminated the lease without finalizing drawings or completing the build out of the space, claiming that the agency had materially breached the contract by providing design intent drawings approximately nine months later than anticipated in the contract, and by failing to provide assurances that the proposed tenant would occupy the space if bus service did not exist within two blocks of the premises. In its offer, the lessor had failed to identify a deviation from the solicitation and contract requirement that a bus stop exist within

two blocks of the offered premises; bus service had ceased prior to the offer and award, and had not been restored.

Here, the lessor seeks (1) non-monetary relief, declaring the rights of the parties under the lease, including that the agency was in material breach and the lessor discharged from remaining performance, and (2) monetary relief, $1,545,282, to compensate the lessor for income it anticipated under the lease and for its additional costs incurred because of the agency's breaches. As justification for its termination of the contract, the lessor alleges material breaches by the agency in two matters: first, relating to the late delivery of design intent drawings; and second, asserting anticipatory repudiation of the contract in the agency's failure to assure the lessor that the tenant would occupy the premises without bus service within two blocks of the premises. The contracting officer issued a decision interpreting the contract and denying the lessor's claim to recover $1,791,029.62 (since reduced downward).

The Board finds that (1) the lessor failed to state in its best and final offer that its proposed premises did not satisfy the requirement of the solicitation that the premises be served by bus service within two blocks; (2) the agency was nine months late in the delivery of drawings; (3) the agency did not provide explicit assurances that the tenant would occupy the premises if compliant bus service did not exist; and (4) the agency continued to encourage the lessor to fulfill its contractual obligations and complete the build out of the space, while it also recognized the contractual rights of the lessor to recover for delays and changes. The Board concludes that the agency's actions are not sufficient to constitute material breaches. Throughout the period, the agency encouraged the lessor to complete the space and recognized the lessor's ability to recover under the contract for additional costs incurred because of agency delays and changes. The agency did not repudiate the contract. The lessor improperly terminated the contract and failed to perform its contractual obligations. The record does not support the lessor's recovery of any of the costs its seeks. Accordingly, the Board denies the appeal.

Findings of Fact

Solicitation and Lease

1.    At the end of July 2009, the agency issued a solicitation for offers (SFO), as it sought to award a contract for leased space in Evanston, Illinois, in response to the needs of the Social Security Administration (SSA). Exhibit 6 (all exhibits are in the appeal file, as supplemented). The agency sent the solicitation under a cover letter to an individual at WD Schorsch; the letter stated that a site (the lessor's premises at Main Street Marketplace) had been deemed conditionally acceptable "if it can meet the solicitation requirements and agency special requirements." Exhibit 6 at 1. The letter stated: "It is very important that any

exceptions to the Solicitation be outlined separately in your offer. We are not encouraging exceptions, we are merely emphasizing that any exceptions must be presented to the Government so that we can properly address those items during negotiations." Exhibit 6 at 2. The agency and the SSA had deemed the site conditionally acceptable during an unsuccessful attempt to secure space in 2007 and based upon a market survey in 2009. Exhibits 2, 3, 4. The solicitation identified special requirements in Attachment 3, General Requirements, under the caption, "Solicitation documents required and or acknowledgment with Best and Final Offer"; one requirement was:

> Evidence site or building is within two blocks from a bus stop, not Metra [a Chicago area railway system] or mass transportation system. Path from bus stop to site or building shall accommodate wheelchair access and must be paved and well lighted.

Exhibit 6 at 57 (¶ 10.1), 61 (¶ 8).

    2.     Although WD Schorsch did not submit an initial offer, by letter dated January 4, 2010, the contracting officer notified the individual from WD Schorsch that negotiations had been reopened and requested a best and final offer to be received by Friday, January 8, 2010. "Negotiations regarding this SFO will remain open until this date." Exhibit 7 at 1. The letter asked that the best and final offer verify concurrence with various provisions, including:

    1)    Your offer is for a fifteen-year, ten year firm lease. The government may terminate this lease at the end of the firm term or the government may terminate this lease at anytime after the firm term by giving a 120 day notice. The government shall not be financially obligated to pay rent after lease termination.

. . . .

    4)    It is our understanding that you have read and agree to all clauses and requirements of Solicitation for Offers - GS-05B017978. There are no lease renewal options in this Solicitation.

. . . .

    8)    Review, acknowledge and return the revised SFO General Requirements.

CBCA 2544                                                                                                   4

Exhibit 7 at 1. Further, the letter specified: "If any of the items addressed in the SFO have not been or are not addressed, your response shall be construed as non-compliant." Exhibit 7 at 2.

3.    Under cover letter dated January 7, 2010, WD Schorsch enclosed a proposal from Kap-Sum to provide existing space at Kap-Sum's Marketplace location, the general location of the conditionally acceptable site. This cover letter stated: "The bus stop is located on Main St in front of the shopping center development and there are sidewalks on both side[s] of Main St." Exhibit 51 at 3. The proposal and cover letter identified no exceptions to any term of the solicitation. Exhibit 51. Moreover, with the offer, the offeror/lessor expressly agreed that "upon acceptance of this proposal by the herein specified date, to lease to the United States of America, the premises described, upon the terms and conditions as specified herein, in full compliance with and acceptance of the aforementioned solicitation for offers, with attachments." Exhibit 51 at 5 (¶ 21).

4.    Although bus service previously had existed at a bus stop within two blocks of the site, the last day of bus service was September 4, 2009, after which no compliant bus stop serviced the site. Exhibit 40 at 6.

5.    An award intent letter, dated February 24, 2010, from the contracting officer, identified the offeror as Mr. Robert J. Bond, Kap-Sum Properties LLC, and the owner representative as an individual at WD Schorsch.

6.    The lessor and agency executed the lease on March 2, 2010, for the term estimated to begin on November 1, 2010, through October 31, 2025, subject to termination and renewal rights as set forth in the lease. Exhibit 11 at 1. Specifically, "as part of the rental consideration, the Lessor shall meet all responsibilities and obligations as defined [in] the Solicitations for Offers Number GS-05B-17978 and other attachments to the Lease[.]" Exhibit 11 at 2 (¶ 6). Provisions of the lease, included by attachment, include the following:

9.    The estimated effective date [of occupancy] in Paragraph 2 is November 1, 2010. If necessary, the actual effective date of beneficial occupancy under this lease will be amended by supplemental Lease Agreement. The lease will be in effect for Fifteen years, ten year firm from the actual effective date. The Government['s] termination[] rights and anniversary dates for escalation purposes will be computed f[ro]m this actual commencement date.

15.     The government shall provide lessor with scope of work for tenant space alterations. . . . The Lessor shall have 120 working days to complete alterations from the date [of] the government['s] issuance of a notice to proceed. Upon completion and acceptance of alterations, the alteration costs shall be amortized over the remaining firm term of the lease.

24.     Bus stop is within two blocks (1/4 mile), the path of travel from bus stop to site/building is paved and lighted.

Exhibit 11 at 3-4. The lease also contains the same general requirements as in the solicitation, as discussed in Finding 1 (site or building shall be within two blocks of a bus stop, and a path from the bus stop to the site or building shall accommodate wheelchair access and must be paved and well lighted). Exhibit 11 at 60 (General Requirements ¶ 8).

7.     The premises had to be built out; the agency would have the premises for a fifteen-year term (ten years firm) beginning on the estimated date of November 1, 2010, through October 31, 2025. The lease expressly provided that the actual effective date of beneficial occupancy, if necessary, would be amended by supplemental lease agreement. Exhibit 11 at 1, 3 (¶¶ 2, 4, 9). An Occupancy Date clause stated: "Occupancy is required not later than 120 days for space in existing buildings . . . after the Government has issued the 'Notice to Proceed with Tenant Improvements' to the Lessor." Exhibit 11 at 10 (¶ 1.7).

8.     The Construction Schedule clause and the Construction Schedule and Acceptance of Tenant Improvements clause detailed obligations of the parties. The agency was to provide design intent drawings to the lessor within 120 working days after award. Within thirty working days of the agency's approval of the design intent drawings, the lessor was to prepare final construction documents for the improvement illustrated on those design intent drawings. Thereafter, the lessor had 120 working days after receiving a notice to proceed from the agency to complete tenant improvements. The space was to be inspected and accepted. The rent commencement date would be the date of agency acceptance with the lease commencement date (to be after acceptance of all space) established by an agency-issued supplemental lease agreement. Exhibit 11 at 23-24 (¶¶ 3.16, 3.17), 55 (General Requirements, Design Intent Drawings).

9.     The lease contained various other clauses, including a Delivery and Condition clause with the following paragraph:

CBCA 2544                                                                                          6

> (b)    If the premises do not in every respect comply with the provisions of the lease the Contracting Officer may, in accordance with the Failure in Performance clause of this lease, elect to reduce the rent payments.

Exhibit 11 at 75 (¶ 10, 48 CFR 552.270-17 (SEP 1999)).  The referenced Failure in Performance clause stated:

> The covenant to pay rent and the covenant to provide any service, utility, maintenance, or repair required under this lease are interdependent.  In the event of any failure by the Lessor to provide any service, utility, maintenance, repair or replacement required under this lease the Government may, by contract or otherwise, perform the requirement and deduct from any payment or payments under this lease, then or thereafter due, the resulting cost to the Government, including all administrative costs. . . . These remedies are not exclusive and are in addition to any other remedies which may be available under this lease or at law.

Exhibit 11 at 756-77 (¶ 15, 48 CFR 552.270-10 (SEP 1999)).

10.    The lease contained a No Waiver clause:

> No failure by either party to insist upon the strict performance of any provision of this lease or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial rent or other performance by either party during the continuance of any such breach shall constitute a waiver of any such breach of such provision.

Exhibit 11 at 75 (¶ 7, 48 CFR 552.270-26 (SEP 1999)).

11.    The Changes clause permitted the contracting officer unilaterally, by written order, to make changes within the general scope of the lease, regarding specifications, work or services, or facilities or space layout.  Further, if any change caused an increase or decrease in the lessor's cost of or the time required for performance, the contracting officer was required to modify the lease to alter the delivery date, equitably adjust the rental rate, provide a lump sum equitable adjustment, and/or equitably adjust the annual operating costs. Exhibit 11 at 87-88 (¶ 34, 48 CFR 552.270-14 (SEP 1999) (VARIATION)).

12.    The lease's Disputes clause stated:

> The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer.

Exhibit 127 at 90 (¶ 37(i), 48 CFR 52.233-1 (JUL 2002)).

Performance, an Overview

13.     At the times the lessor submitted its offer and the agency made the award, a bus stop did not service the premises within two blocks. Finding 3. On May 25, 2010, after first learning that bus service may have been discontinued at the stop near the premises, the contracting officer sent an inquiry to an individual at WD Schorsch seeking verification that a bus still served the location. Exhibits 13, 113; Transcript at 599.

14.     On May 26, 2010, the contracting officer understood that compliant bus service no longer existed. On that day he notified an individual at WD Schorsch asking him to advise the Chicago Transit Authority (CTA) that the SSA will relocate effective January 1, 2011, that bus service is needed for the community, and that six blocks (apparently the nearest bus service) is too far to walk. Exhibit 14.

15.     Thus began an on-going dialogue between the parties, as well as by, between, and among the parties, the SSA, city officials, and others, as an attempt was made to get bus service restored or bus service created within two blocks of the premises. *E.g.*, Exhibits 15-22. On August 25, 2010, the contracting officer informed an individual at WD Schorsch of the solicitation's requirement for the bus stop and noted that the location was selected because it met the need for a bus stop. Exhibit 15.

16.     By letter dated August 11, 2011, a regional commissioner for the agency requested the CTA to reinstate the previous or modify existing bus service so as to service the leased premises. Exhibit 36. In a response dated September 8, 2011, the CTA declined to grant the request to provide bus service within the required distance. Exhibit 39.

17.     Apart from the bus service inquiries, the parties also engaged in an on-going dialogue regarding the agency's delivery of the design intent drawings. The lessor expressed concerns both before and after the drawings were due (120 working days after notice of award, Finding 7) on August 19, 2010. Exhibits 72, 74, 76, 78-79, 81-83, 100-05; Transcript at 615-16. The SSA had encountered difficulties in completing design intent drawings, and engaged in various deliberations to settle upon acceptable design intent drawings. The particulars are not here relevant. The agency shared with the lessor few details regarding the

completion of the design intent drawings. While the agency successively provided the lessor with anticipated dates for the delivery of design intent drawings, those dates often were overly optimistic and not based upon an accurate or reasonable assessment of the SSA's situation and the factors involved in completing design intent drawings. *E.g.*, Exhibits 73, 86-89, 92-97. However, the agency never suggested to the lessor that the space would be abandoned or that performance should not continue to completion. The on-going dialogue between the contracting officer and lessor indicates the agency's interest in having the space built out pursuant to the yet to be delivered design intent drawings. For example, on March 22, 2011, the contracting officer notified the lessor that the SSA had informed the agency to proceed with the design intent drawings. Exhibit 101. On May 23, 2011, the contracting officer wrote to the lessor that the agency was hopeful that bus service would be restored by the time the space was ready for occupancy. Exhibit 106. The agency consistently indicated, by words and its on-going actions in providing design intent drawings and asking the lessor for information concerning its completion of the space, that it sought contract performance to continue such that occupancy would occur.

18.     In late May 2011, the agency furnished design intent drawings to the lessor. Exhibit 107. The goal of the agency and the SSA was to occupy the space; the agency did not have an interest in terminating the lease. Transcript at 624. While the agency provided the drawings late, the lessor factually has not shown any specific monetary impact or expenditure incurred either because it received misleading information regarding the delivery date of the drawings or because of the actual late receipt of the drawings.

Correspondence and Other Particulars

19.     By letter dated April 5, 2011, to the contracting officer, the lessor expressed its view that the SSA had breached its duties, as tenant, under the lease. Stating that the projected rent commencement date likely would be at least one year later than that estimated in the lease, the lessor proposed a resolution to the agency, under which the rent would commence retroactively, as of November 1, 2010, payable immediately, and thereafter payment would be made currently as dictated in the contract, and the lessor would recover its out-of-pocket expenses related to that controversy. Exhibit 102.

20.     In a responsive letter dated April 18, 2011, the contracting officer referenced the Changes clause, noted that the estimated effective date for the commencement of the lease had changed to November 1, 2011, and provided assurance that the lease would run for fifteen years, with ten years firm, from the actual commencement (occupancy) date. Further, the letter specified that a general requirement of the lease, paragraph 8 of attachment 3, required a public bus stop to be located within two blocks of the offered space. Further,

> As you know, I have stated on numerous occasions bus service is needed to accommodate SSA employees and the public for this location. Also, a member of the public recently circulated a petition to the SSA Commissioner with over 60 signatures, stating this office relocation should not occur without adequate public bus service. Please let us know what steps you are taking to meet this requirement of the lease.

Exhibit 28. The letter concludes with the following three sentences: "I appreciate your patience in this matter. I look forward to working with you until this lease becomes effective, and I look forward to a mutually beneficially [sic] occupancy. If there are any questions, do not hesitate to contact me." Exhibit 28.

21.    The lessor expressed concern, in a letter dated April 22, 2011, that the agency had failed to address the subject matter of the lessor's letter of April 5. The lessor described itself as being

> on a path to pursue a breach claim due to in part the untimeliness and inaction of your client Agency as well as the non-receipt of Design Intent Drawings, which have not yet been delivered to the Landlord. I was not posturing for a delay claim which would be easy to substantiate.
>
> Instead, GSA's material breach has created a situation where the Government no longer has an absolute contractual right to occupy the space. Legally, the Government's material breach has provided Lessor with an election of whether to continue with the Lease and seek delay damages or to terminate and pursue other opportunities in the marketplace, in which case, the Government will be liable for Lessor's expectancy interest {i.e., lost profits} in the lease.

Exhibit 29 at 1. In the same letter, the lessor opined:

> Paragraph 8, Attachment No. 3 - General Requirements of the Lease does require a public bus stop to be located within two blocks of the offered space. The Lease was executed by the GSA. A CTA bus did stop within two blocks of the space during the process. However, the transit authority cancelled the route subsequently, which was obviously an action taken beyond the control and without any fault on the part of Lessor. Thus, any noncompliance with this requirement caused by the CTA's actions is excusable with regard to Lessor. The CTA has absolute authority over where bus stops and routes are planned, not the Landlord. It is not reasonable that a Landlord would be responsible for a decision that is completely out of its control.

Exhibit 29 at 2. The lessor sought a specific response to the proposal in its letter of April 5, 2011. Exhibit 29 at 2; Finding 19.

22.    The contracting officer informed the lessor on May 23, 2011:

According to lease contract the offered space does not meet a significant requirement of the lease to have bus service within two blocks of the offered site. At this time there is not bus service. We are hopeful that bus service is restored by the time the space is ready for occupancy. At that time GSA will entertain your request for damages.

Exhibit 31.

23.    On May 27, 2011, the lessor received the design intent drawings. Exhibit 107. Within thirty days, the lessor was required to prepare final construction documents based upon the design intent drawings. Thereafter, the construction, completion, and turnover of the space were to have occurred. Finding 8.

24.    On June 2, 2011, the contracting officer informed the lessor:

GSA will consider your request for equitable adjustment when it is known all the terms of the lease requirements are met. However, GSA does expect you will continue to abide by the lease contract for the delivery of space. Pursuant to Paragraph 33 "Changes" of the General Clauses of the lease, the Contracting Officer can make changes to the contract. As you are aware there has been numerous correspondence and meetings regarding the delivery of design intent drawings. The lease contract terms will not change as a result of when the delivery of the design intent drawings were made. The Government's financial commitment remains the same.

I appreciate your patience in this matter and look forward to working with you as you continue the process to develop a price proposal for tenant improvements and ultimately the space build-out/alterations for a new Social Security Administration office in Evanston, Illinois. I also appreciate your efforts to secure a reinstatement of a bus stop to accommodate the claimants, visitors and employees to this office. . . . I believe we can and will reach an equitable adjustment. I would ask you, according to the lease contract to develop a price proposal for tenant improvements which is fair and reasonable so that we can expeditiously move this process forward. GSA supports your

efforts and will continue to participate with others to secure the re-instatement
of a bus stop for your location.

Exhibit 108. Again, the agency expressed its expectation that the lessor perform its
obligations to deliver the space. To this correspondence, the lessor replied the same day,
seeking clarification: "Will the SSA occupy the space at our shopping center without bus
service? I would like to know the answer to that question asap." Exhibit 108. The
contracting officer responded on June 7, 2011, stating that he would have a response by the
beginning of the following week, and that he looked "forward to receiving your tenant
[i]mprovement price proposal along with construction drawings based upon the Design Intent
Drawings provided." Exhibit 110.

        25.    The contracting officer informed the lessor, on June 8, 2011, that the contract,
paragraph 3.17C, obligated the lessor to provide construction documents within thirty
working days of the agency's approval of the design intent drawings. Also, "I understand
we have a difference of opinion regarding other issues of the lease, however, I would expect
you will continue to move this project forward in good faith as we work through those other
issues." Exhibit 112. The lessor responded that evening, stating in pertinent part:

        We on behalf of the Lessor have complied with all elements of the lease to
        date, but your unwillingness to respond to our inquiries suggest that the
        Government has repudiated its duty to perform under the lease. This action by
        you excuses us as the lessor from performance. Consequently, in the absence
        of an affirmative commitment of the Government to proceed with the lease
        without bus service, as I have stated numerous times previously, we are not
        moving forward and expending any further resources. I will not be induced to
        proceed any further until you answer my question directly, specifically and
        without any cloud or reservation.

        I request no less clarity as it relates to the damages as mentioned before. We
        need to have it specified and agreed upon.

        Your failure to do so will lead to litigation that will cost the GSA a lot of
        resources. With your written confirmation that the Government is prepared to
        proceed without bus service, the lessor will commence the design work. We
        look forward to your prompt reply.

Exhibit 112.

CBCA 2544                                                                                                12

26.    On June 16, 2011, the contracting officer wrote to the lessor, "We are waiting for a response from the SSA. I will get back to you when a decision is made." In response of the same day, the lessor noted: "Failure to move forward by the SSA is a legal breach and they would be responsible for the complete lease amount, legal fees, costs etc. This further bad faith delay is not acceptable. Someone needs to make a decision before this gets ratcheted up." Exhibits 33, 110.

27.    The lessor did not provide construction documents. Therefore, it failed to comply with the lease requirement that such documents be provided within thirty days of receipt of the design intent drawings. Findings 8, 25.

Termination and Certified Claim by Lessor

28.    By a submission dated July 28, 2011, the lessor provided the contracting officer with a certified claim and a notice of the lessor's termination of the lease. The lessor sought non-monetary relief and monetary damages arising from what the lessor characterized as material breaches by the agency. The lessor asserted that the agency materially breached the lease by failing to perform its express and implied obligations with respect to the design of the leased premise--specifically, failing to provide design intent drawings within the 120-day period specified in the lease, and delaying occupancy for more than one year beyond the expected occupancy date. The lessor maintained that the agency repeatedly misrepresented to the lessor the expected delivery date of the drawings. Further, the lessor contended that

GSA has anticipatorily repudiated the Lease, unequivocally stating that the tenant agency will not occupy the leased premises unless bus service is restored and failing to provide any contrary assurances of performance despite an opportunity to do so. Under the lease, local bus service is not an obligation of the Lessor and is not a condition that can justify or excuse the Government from occupying the leased premises.

Exhibit 35 at 1-2. The submission identified the lessor's claim for

(1) non-monetary relief in the form of a declaration of the parties' rights under the Lease, including a declaration that GSA is in material breach and that Lessor is discharged from remaining performance under the Lease; and (2) monetary damages in the amount of $1,791,029.62 to compensate Lessor for the loss of its expectancy interest in the Lease and additional costs incurred because of the Government's breach.

Exhibit 35 at 2. The lessor also stated that the agency had unjustifiably repudiated the lease based on the bus stop issue: "By the time Lessor received the DIDs [design intent drawings], GSA, without justification, repudiated its obligation to occupy the leased premises under the Lease, which constitutes an anticipatory breach of the Lease." Exhibit 35 at 11.

29.    By decision dated August 29, 2011, the contracting officer responded to the lessor's claim, concluding that it was without merit. The contracting officer determined that the lessor was technically in default of the lease (because of the lack of a bus stop to service the premises) and that the default by the lessor superseded the agency's delay in delivering the drawings. The contracting officer denied the lessor's claims for delay damages. Further, the contracting officer identified the Changes clause as allowing the agency to make changes, including the extension of time in performance. Exhibit 37.

Damages Claimed by the Lessor

30.    The lessor has refined the relief it seeks to an entry of judgment in its favor (1) awarding $1,545,282, inclusive of interest through August 31, 2012, plus statutory interest thereafter, and (2) declaring that the lease and lessor's obligations thereunder are terminated. Regarding the monetary award, the lessor seeks the rent and other costs it would have received under ten years of the lease, as off-set (or mitigated) by income from its subsequent lease of a portion of the space, with a discount factor applied to arrive at a present value. (This approach fails to account for expenditures the lessor would have incurred to complete the space for occupancy, and would place the lessor in a far better position than if the contract were performed.) The lessor calculates this amount as $437,918 in lost revenue through October 31, 2012, and $976,520 as the present value of lost revenue for the remainder of the firm term of the lease. To this sum it adds a $50,000 commission expense incurred in securing the subsequent tenant; $4715 in architectural expenses seemingly incurred for construction drawings used by the agency and, subsequently, the replacement tenant; and $26,250 said to have been paid to WD Schorsch as a consulting fee. Further, the lessor adds statutory interest from when it submitted its claim on July 28, 2011, through August 31, 2012. The lessor notes further that it had and continued to incur legal fees and expenses. Exhibit 116; Transcript at 126-27; Lessor's Post-Hearing Brief at 5, 29-31. Actual proof of payment is not in the record for expenses referenced in invoices.

Discussion

The lessor disputes the agency's interpretation of the contract and determination of the obligations of the parties thereunder. The lessor contends that the agency materially breached the contract by its unreasonable and misleading projections as to when design intent drawings would be delivered, by the nine-month delay in the delivery of design intent

CBCA 2544                                                                                                    14

drawings, and by its failure to provide a specific assurance that the tenant would occupy the premises if there was no bus service within two blocks of the premises.

The contract anticipated that the agency would furnish design intent drawings by August 19, 2010. Finding 17. During the course of performance, the agency provided inaccurate and unreasonably based projections as to when it would make available the drawings, which it ultimately delivered on May 27, 2011, approximately nine months late. Findings 17-18. Although the contract estimated that occupancy would begin November 1, 2010, it also noted that if necessary, the actual effective date of beneficial occupancy would be amended by supplemental lease agreement. From occupancy, the lease would continue for fifteen years, with ten years guaranteed. Findings 6, 8. Under the Changes clause, the contracting officer could unilaterally alter dates within the general scope of the contract and equitably compensate the lessor for increased costs of its performance. Finding 10. The Disputes clause required the lessor to proceed diligently with performance pending final resolution of any request for relief arising under the contract, and to comply with any decision of the contracting officer. Finding 12.

Although the contracting officer provided inaccurate information relating to when the agency would ultimately furnish design intent drawings, the record does not demonstrate any adverse consequences to the lessor. The contracting officer continued to express optimism that the design intent drawings soon would be forthcoming, but the agency and lessor had to wait until the SSA worked through its difficulties. The lessor has not demonstrated that it had any right to be made timely aware of the deliberations within the SSA, or that with accurate information the lessor could or would have done other than it did, namely, await the drawings before engaging in the next step toward occupancy. The record does not reveal bad faith by the contracting officer, as he continued to express hopes that occupancy would occur sooner rather than later.

The lessor contends that the period of delay by the agency constitutes an agency breach. However, as the Federal Circuit expressly has recognized: "Not every departure from the literal terms of a contract is sufficient to be deemed a material breach of a contract requirement, thereby allowing the nonbreaching party to cease its performance and seek appropriate remedy." *Stone Forest Industries, Inc. v. United States*, 973 F.2d 1548, 1550 (Fed. Cir. 1992). Consistent with the opinion in *Stone*, F.2d at 1550-51, the Board looks to the Restatement (Second) of Contracts § 241 (1981), which specifies:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:

(a)     the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b)     the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c)     the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d)     the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e)     the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Addressing the factors in order, the lessor would be deprived of some reasonably expected benefits under the lease by delayed occupancy. The lessor would be delayed in receiving lease income beginning in November 2010 until actual occupancy; the commitments as to the length of occupancy and payment were not altered. While the change in the period of income does not entitle the lessor to specific relief, *Altmayer v. Johnson*, 79 F.3d 1129, 1132 n. (Fed. Cir. 1996), delay damages are recoverable, *6000 Metro LLC v. General Services Administration*, GSBCA 15725, et al., 04-1 BCA ¶ 32,510. The lessor could be adequately compensated for the delay, as the contracting officer recognized throughout the process. A determination of material breach would leave the agency (and its proposed tenant) without a space and potentially lead to further delay while a new procurement is completed. This would mean that resources (money and time) expended on this procurement were for naught. The actions of the agency comport with standards of good faith and fair dealing; nothing in the record suggests that the agency knew of or anticipated the difficulties at the SSA which led to the delays in completing design intent drawings. While a nine-month delay by the agency in the delivery of design intent drawings is significant, such is within the general scope of the contract and not a material breach, when the factors are considered in light of the length and terms of the contract.

The Changes clause recognized that the contracting officer could make changes within the general scope of the contract. The contract expressly provided that the initial occupancy date of November 1, 2010, was an estimate subject to revision by the contracting officer. Here, the nine-month delay by the agency in the delivery of the drawings was within the

general scope of the contract containing an occupancy term of fifteen years, ten fixed. The lessor could be compensated for delay damages and made whole, as recognized by the contract and case law.

The lessor asserts a material breach by the agency in its failure to provide specific assurances that the tenant would occupy the space upon completion. The failure to provide specific assurances of timely completion is a branch of the law of anticipatory repudiation. In support of this aspect of its claim, the lessor relies upon various cases, including *Danzig v. AEC Corp.*, 224 F.3d 1333, 1337-38 (Fed. Cir. 2002), and, as referenced by that court, the Restatement (Second) of Contracts § 251. That Restatement provides:

> Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach under § 243, the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.

The lessor had no contractual right to issue a cure notice to the agency. However, the Board need not here determine the full extent to which this doctrine in the Restatement applies in government contracts. The factual scenario does not support the lessor's position and reliance on this provision, given that a basic element is lacking. Namely, the lessor had no reasonable basis to conclude that the agency would not fulfill its obligations under the contract. Regardless of whether or not the SSA occupied the premises, the agency remained obligated to perform under the contract. As a non-party to the lease, SSA's occupancy is not relevant.

The lessor in particular points to the issuances of the contracting officer on April 18, May 23, and June 2, 2011, Findings 20, 22, 24. Lessor's Post-Hearing Brief at 36-37. These and other communications reflect the opposite of repudiation. The agency continued to exhort the lessor to continue with performance, revealing the expectation that occupancy would occur and an equitable adjustment would be provided under the contract. Despite the discussion of the need for bus service, each correspondence discusses the lease becoming effective and beneficial occupancy. Whether or not the given proposed tenant would ultimately occupy the space, the agency, the actual party to the lease, continued to insist that the lessor fulfill its contractual obligations and make the space ready for occupancy. Moreover, the agency also recognized its obligations under the contract. Although the agency did not commit to the SSA occupying the space, there was neither silence nor a repudiation as the agency expected the lessor to deliver the space.

In *Malone v. United States*, 849 F.2d 1441, 1445-46 (Fed. Cir. 1988), the Court observed: "In light of the [contracting officer]'s evasiveness, and the consequent interference this caused in Malone's performance, the government's conduct in this case rises to the level of a material breach of contract. This breach provides Malone with a legal right to avoid the contract, discharges Malone's duty to perform, and relieves Malone of the default termination and its consequences." In contrast, this contracting officer consistently informed the lessor to proceed with performance and make the building ready for occupancy. Any perceived evasiveness by silence regarding tenant occupancy was not material in light of the specific statements by the contracting officer that the lessor was to perform. The completion and occupancy urged by the agency reflect the antithesis of repudiation. The lack of response to the lessor's specific questions did not interfere with or alter the lessor's ability or obligation to perform.

The lessor has not demonstrated a material breach by the agency or circumstances which justify the lessor's termination of the lease. The lessor was obligated to deliver completed space ready for occupancy. The lessor failed to do that.

Damages

The lessor seeks damages. Finding 30. The damages largely relate to the lessor's efforts to relet the space and lack of income from the lease with the agency. The agency did not breach the contract. The lessor is not entitled to recover costs or lost income arising from its own improper termination of the contract. The agency was late in its delivery of design intent drawings. None of the costs sought by the lessor represent costs it incurred because of those delays. Accordingly, the lessor recovers no money because of the agency's delays.

Decision

In the discussion, the Board interprets the contract and sets forth the obligations of the parties. The Board **DENIES** the claim of the contractor.

JOSEPH A. VERGILIO
Board Judge

We concur:

JERI K. SOMERS
Board Judge

R. ANTHONY McCANN
Board Judge